Number 241786 and 251067, Keila Garcia Colon v. Corporation of the State Insurance Fund. We will call those jointly. So council will have 20 minutes each side. You have your 20 minutes so use them as you wish between the two cases and then are you going to save any time for rebuttal Mr. Gonzalez? Yes please. I would like to have four minutes for rebuttal. Okay four minutes for rebuttal and you may proceed and you don't have to use the whole 20 minutes but I think it's better to just have the 20 minutes rather than 10, 10 and then call the others. Okay so now I don't have to ask you for indulgence if I had to commingle the two because sometimes it was not that easy to keep them separate. But I'm going to start with the denial of the permanent injunction. I brought Ms. Keila Garcia here because I have to explain to her that her victory may not have been, may not be a pyrrhic one depending on the outcome of these appeals. It is paradoxical that she is a prevailing party. That she proved a hostile work environment, the district court applied a standard that was higher than what was required at the time, the Noviello versus City of Boston which was later overruled by this court. And that her employer did nothing and the district court found that she did not prove that her involuntary transfer, which was at the time the major incident of her claim, that she did not prove that it was retaliatory and that the court had no jurisdiction. Well I don't know about the no jurisdiction. I'm sorry? I don't know about the no jurisdiction so let's lay that to a side. Let's say, because Judge Arias made alternative rulings. One, it wasn't in the complaint but then he dealt with it. So let's focus on the he dealt with it and rejected it. What I understand him to be saying is there was a constellation of facts submitted to the jury that could support a hostile work environment. And I read them and there's a lot of things that happened. And his point was the jury could have found a hostile work environment based on retaliation without having found that the transfer was retaliatory. That is a possible, not the only way, but a possible way to read the verdict. And what he says from there is then therefore I have to decide whether the transfer was unlawful. And he goes through and he says why there was a legitimate reason for that that wasn't rebutted and so he denies the injunction on that basis. Why is that the wrong way to think about the case? It is wrong for several reasons. First, in the case of O'Rourke versus City of Providence, this court held that the hostile work environment was one adverse employment. Right. So the problem in that case was you had sexually motivated conduct and other, you know, I'll just call it mean conduct, and the district court wanted to separate those out and said you can only present at trial the sexually related conduct. And the court said no, it's all part of the story of why they treated this person that way. And so O'Rourke was followed here. You got to tell the whole story of all the things you said were done to your client, but that doesn't mean we know what the jury found convincing when it ruled hostile work environment. Well, the first thing is I have to bring to the attention of the court the case of Miles versus Indiana because the first question is why did Judge Arias have to go into Miles? Miles is a Seventh Circuit case. Judge Arias amended the holding of Miles. He put a false period after contention and did not do what he was supposed to do to dissipate or dispel any possibility of making the judgment certain. The judgment was not uncertain. The jury found that she was retaliated against. The jury found that her employer did nothing about it. The jury gave her $200,000 in damages. And the judge had no reason to question the explicit and implicit findings because that is a violation of the Seventh Amendment. And one of the things that he did was to go into credibility determinations, for example, as to the validity of the non-retaliatory measures proffered by the State Insurance Fund. It's impossible for her to win if the jury did not find that they were either a pretext or they were true, but they were not a true reason. Let me ask you because there is a jury verdict form, which we have in the record. Was there any request, because, again, it's a very general finding, but was there any specific request by your client to have a more detailed verdict form? The verdict form that we submitted at one point, it was more detailed. I have to be honest, I don't remember how far into the detail I went, so I don't want to say that it would have covered that part. Well, at the charge conference, did your client object to this verdict form, or did she say, I object and I request that it also contain specific findings? Because in my experience, I have seen verdict forms that are very general. I have seen more specific ones. It varies on what is requested from the court. No, Your Honor, I don't think we went that far. So I think even though this was not the verdict form that we proposed, the one that we proposed was not asking for specific findings. And part of it is because just to see the irony of the ruling, Judge Arias did not find one single act to be retaliatory. And I think that is the wrong approach. Well, Ms. Bargus did things that seemed not kind to your client, right? Supposedly at the behest of the people above her, right? That was part of it. That was part of it. Part of it were these false, potentially false complaints about her, right? Then the transfer is alleged to be part of it. Do you think if you put the transfer aside, but you agree that the things that Ms. Bargus did at the behest of her higher-ups and the false complaints against your client, if the jury only found those things, would have been within its rights to find a hostile environment? I think so. Right. So how do we know they found the transfer? Because I think that if you look in partner resources, which I cite instead of Miles, just for the fact that the court has to not only look at the evidence, it has to look also at the verdict. I'm sorry. It also has to look at the surrounding circumstances and at the jury instructions. The jury instructions are part of the addendum, pages 1 to 10 of the addendum. It is impossible, or it's extremely unlikely, if you look at those jury instructions, if the judge had considered them, to find that the transfer was not retaliatory. The transfer, there's evidence in the record. The only evidence in the record about transfers is Article 25, Paragraph 8. The only one. And it says that an involuntary transfer cannot exceed five days. As of today, 674 working days. Okay. So that in itself, for me, and I argued it to the jury, this is arbitrary, it is capricious, and it is retaliatory. In your appeal, you do spend most of your time on the transfer, and you've spent most of your time on the transfer here today. Your briefing on the expungement was, I would say, much less pronounced and not really well developed. Are you really pursuing that, or are you really pursuing the transfer? I am pursuing it because evidence was presented that they were baseless. She had a referral that was frivolous. There was evidence that that could have been used against her in the future. The judge does not account for it, but it is in the record. There was evidence in the record that it can be taken into consideration for further discipline. So, yes, we are following that, too. And when you have the amount of people, policymakers at a higher level, at the regional office participating in the transfer and just looking away from what's going on, how can none of the acts by themselves be retaliatory? And we have to look at a hostile work environment as an environment that is not conducive to work, that is retaliatory, that is discriminatory, and that there was no reason for it. And I think that's what the jury found. That's what the jury found in its explanation. Let me ask, because you mentioned at one point that this was a Seventh Amendment violation. Yes. But you had a jury trial, or your client had a jury trial. She was entitled to the Seventh Amendment. She got her jury. She prevailed. But what we have here is equitable relief, which is not governed by the Seventh Amendment. In Miles, and I believe Putnam also. Actually, no. The other case is the one that I used from the District of Maine. It says that when a court is considering preliminary, I'm sorry, equitable relief, that has to go into issues that weren't necessarily presented to the jury. Those cannot be questioned, and Judge Arias did. He did this trial anew to deny the permanent injunction. That begs the question. I'm sorry. You're correct as a general principle, and Miles is correct as a general principle. And the question is, what did the jury necessarily decide, which is why my colleagues asked the questions that they did, about a more specific jury verdict, or why the other retaliatory acts that you argued to the jury would not have been sufficient by themselves to support a verdict. And I guess I'm still waiting for the argument that demonstrates why the jury necessarily found the transfer was retaliatory. Okay. There are no specific findings, so we have to look at the surrounding circumstances, and we have to look at the jury charge that was given to the jury. And we cannot or this court should not ignore the nature of the hostile work environment cause of action. That is the adverse action. And what I posit is that everything was retaliatory. That's what brought it together. Everything was retaliatory. The transfer was retaliatory. The baseless complaints and the retaliation that she complained about, how she was being followed and misguided as a threat and everything. So I don't have an answer. I cannot tell you what the jury said, but you know what? I don't think it is the right focus to be questioning what the jury found. But there could have been different instances of retaliation. We don't know which one. As long as you have one, your client prevails. No, I don't think so. I think that maybe some of them were just not as, I mean, a death threat, if that was, you know. That is certainly extremely. But that happened much before the trial. As a matter of fact, at trial, most of the evidence that was presented to prove the retaliation was related to the transfer. Could I ask you a couple of different topics related to the second appeal? As I understand things, the defendant has not appealed either the jury's damage award or the amount of fees that were awarded to you, correct? We have a final judgment. Have those been paid? Have those been paid? No. I'll ask defense about this if my colleagues do not, but I don't understand why they have not been paid yet. Well, that's a good question because the judge stated execution of the judgment. So can I just say what I understand to be happening? Because I have a question about finality of the execution order. So what I understand to have happened is there's a Puerto Rico statute that says that judgments can be paid on a payment plan and that they brought that forward during the post-judgment period and said to Judge Arias, this law is governing, and Rule 69 makes this the law that governs execution of the judgment. And he ends up saying, okay, I stay the case where they go out and get a payment plan order from the Secretary of Justice, and he stays the case pending them doing that. And I guess my question to you is, since it was a stay, does that a final post-execution judgment that we can review? And if so, why? If the stay is reviewable? Yes. Yeah, it is because the judge had no authority to order a stay because the judgment, the monetary judgment, was final. The monetary judgment was final, but if you look at our case law, we divide the world out and we say, okay, you could appeal, somebody could appeal the final judgment of the $300,000 award. No one has done so. Okay, that's done. Then there's the second part of the case, which is actually collecting the money. And our cases say there's a separate finality question around those kinds of orders. So we have an order that's a stay. Now, the general rule is stays are not final. We do have cases about stays that are indefinitely placing you out of court, and those require, one, that they be indefinite, and, two, that the judge was incorrect in doing it. And my question is, is this incorrect? I think it is incorrect. Because I think it's indefinite, so is it incorrect? Well, sine die means without a date. That's my understanding of the Latin. But is it correct that they have to go get a payment plan for this thing? Your Honor, yes. But the thing is, they have not done anything about it, and that is a final judgment. And I have said it in the briefs. And the state insurance fund does not depend on the central government to pay this judgment, number one. Number two. Are they a public corporation? They are a public corporation, number two. They were not a debtor under PROMESA. Right. Number three, number three. They have the affirmative duty to go and offer the payment plan. Ms. Garcia has not gotten one penny. Why? There's no reason for it. Let me ask you, why does there have to be a payment plan? This is not a state law case. It's an issue of federal law, so that. Well. America law doesn't apply here. That's number one. Well, actually, in May, if it goes into the collection, how it's going to be collected, because local law. But you've got an argument under Section 1988 that. Yes. That this kind of a provision undermines the federal right. Oh, yes, it does. I mean, definitely it does. You have two separate orders, right? You have the judgment for the $300,000 of compensatory damages under Title VII, right? And you have another about $300,000 fee award under Title VII, right? Yeah. And those are separate. So you have separate judgments from the district court that in aggregate are $600,000, but are really separate, correct? Yes. They are separate, but they are both. Those two amounts are both final. Because even though we're challenging the attorney's fees amount, the amount of $297,000 or something. No, that's a different question. When a judge. So you appealed the attorney's fees, so that number is not certain. I understand they haven't challenged the first $300,000. There's $70,000 in dispute. What Judge Arias says is, I don't know what the final number is. And so while that's being fought out here, I have no jurisdiction to do anything about execution of that. Is he right or wrong about that? And if he's wrong, why? I think he's wrong because he had jurisdiction to make that order, the attorney fee order. He reached an amount, which was the $297,000, that was not challenged by the state insurance fund. And that is final because it's the least amount that Ms. Garcia can get for attorney's fees and costs. So if she prevails in her appeal on attorney's fees, it's going to go up. But that number is not going anywhere. So it is final. So he had jurisdiction because the district court gives jurisdiction of things that are not on appeal. There was no specific request to the judge, judge, order that this amount, $300,000, whatever it is, be payable now, and we reserve the right on appeal to request for any additional funds. That hasn't been done. I requested it. He noted it and said he did not have the jurisdiction. Okay. Thank you, counsel. Mr. Miller. Counsel for Apley, please introduce yourself on the record. Peter Miller for Apley, Fondo Seguro del Estado, State Insurance Fund Corporation. I'm going to call it, if I may, the fondo. That's what everybody knows it here as. And I'll start with the first thing, which is the purpose. Actually, can you start with the second? Can you start with the execution issues? I think they're harder, to me, they're harder than the injunction issue, to understand the law, at least. To us, I think Judge Arias operated very correctly. He saw that my brother, who I learned over these four years is a very effective guy, said, pay us. And so at that point, so it's not a matter of are you going to get paid, it's how do you get paid. And that's where Law 66 of 2014, which was amended by Law 68 of 2023, and under 42 U.S.C. 1988, it states that state monies like this get paid under state law plans. That's not what Section 1988 says. Right. So can we separate them? They might be different because Rule 69 says execution of a money judgment must comport with state law unless a federal statute governs. So what is the ---- I might have misquoted, Your Honor, I might have misquoted the federal law, but I know that the federal law states clearly that cases like this get paid according to state law. And state law says, in this case territorial law, says you're going to pay it under a payment plan. And all that's going to happen here, once this court issues its decision, I am sure my brother will let the trial court know it's over and done with, and then if we get upheld, it's going to be paid under a payment plan. Well, have you taken the $300,000 judgment on the Title VII compensatory damages to the Secretary of Justice to get a payment plan? And that is done. What we have to do is ---- That wasn't a hard question. Have you taken ---- Have we done it? Not yet. And why? Because the judge ordered a stay. We have told our client ---- That stay will go on for the rest of time. That cannot possibly be the answer. Let me add to this. Why does the state insurance fund have to ask for a payment plan because out of all the agencies, and I think this is probably the court can take judicial notice, there's a surplus of, you know, it's one of the few agencies that is still ---- Well, the only one that I know of. It's the only one. It's got money, and all the time legislators are looking, let me see how I can get that money out of there. Your Honor, guess what?  The board knows it, too. And as of 2017, it's one unique government. It's one unitary government. And it has happened in the past that the main government goes to the fondo and says, we need some of that money over here, and it gets transferred. Right now it hasn't happened. No. If I were the district judge and right now I were to pay $300,000 and it doesn't get appealed, it would be paid ---- But law 68 would govern, so it would still be under a payment plan. I just want to nail this down. Your plan is to not go to seek a payment plan until Judge Arias lifts the stay? That's correct. And he entered the stay for you to go get a payment plan. But then he appealed. And while it's appealing, the stay is there. As soon as ---- He didn't appeal that. So the Supreme Court has said attorneys' fees, that's a final judgment, separate from the final judgment on the merits of the case. The merits of the case have happened, have not been appealed. They tried to execute the judgment. Judge Arias said, I'm staying execution of the judgment because this state statute allows you to go seek a payment plan. And I will wait for the payment plan. And your answer to me is, I'm not going to go get a payment plan until there's no stay. In that logic, there will never be a payment plan. And that can't be right. Let me correct myself, sir. What will happen is a decision will emanate from here. As soon as that becomes firm and final, there will be a payment plan in place. Because he's going to ask to execute it, and we have to do it under state law. But why does, again, I'm going back to Judge Hamilton's question. How can the state law trump Section 1988? Because Section 1988 doesn't say there has to be a payment plan. What it does say is that it has to happen according to state law. And that's what state law says in cases over 100. It says that unless it will follow state law so far as the same is not inconsistent with the Constitution and laws of the United States. And let me put the hypothetical to you. Suppose Puerto Rican law said that in the case of a judgment of this kind, payments will be made out over 20 years. Do you think that would be consistent with the federal remedies under 1983? I think somebody would have challenged it immediately, just like other people were challenging state laws here today. As inconsistent with federal law, right? If it was something under your hypothetical, sir, that would be, you know, 20-year payment plan is pretty outrageous. Our payment plan is three years. Why is any payment plan appropriate given that there is a final judgment from a federal court that says to the defendant, pay the plaintiff $300,000? Well, because the territory of Puerto Rico is broke. Not the fund, not the state insurance fund. The state insurance fund is a covered entity. Every Wednesday, people from McKinsey & Company come and meet with the finance office, the finance director for the fondo to check the fondo's finances. Every Wednesday. That's been happening now for eight years. They are a covered entity. We are most definitely under the juntas. Well, that's what they call it in Spanish. You're under the financial oversight board, but the state insurance fund did not go bankrupt. It didn't, but nevertheless, since PROMESA's powers to the fiscal oversight and management board are so broad, they're at the fondo. They are telling the fondo where you can spend your money and where you can't. So in that sense... But if there's an order from the court, the financial board cannot say we're trumping that federal order. This is not a state court order. Any order from this court is going to be followed, sir. You know that. But going back to this, I think the court, when it saw that... Because remember, the first appeal, the permanent injunction one, was a 24 appeal. This is a 25 appeal, right? So I don't know what... I mean, George Arias was pretty clear as to why he did what he did, and I think he had the jurisdiction to do it. And I think the jurisprudence is pretty clear that he had ample jurisdiction to do this, which he did. But once the case is firm and final, she's going to get paid. There's no doubt about that. Mr. Miller, I guess I'm still having trouble. Okay. We've got a final judgment... Yes, sir. ...as to both the verdict and the fee award. You have not appealed either one, and you have the money available. Why not pay her? Because he appealed them. He appealed... Those amounts, he's correct, those amounts cannot go down. Well, the fee award did go down. That's still in play. I'm talking... Please stop. I'm talking about the final judgment and the verdict and the separate final judgment with a final fee award that you did not appeal. Those numbers are not going down. You have the money. Why have you not yet paid them? Because the trial court... Because nobody has made you pay them, right? That would also be correct. So why should we delay that any further? Why should we not issue a mandate this afternoon saying pay those amounts? If you said pay them in accordance with Law 68 of 2023, we would do so immediately. And if it doesn't say that, you still have to pay them. Like I said, whatever you say is going to be the final holding here. I mean, what you're saying, I think, is that under the rules, execution must accord with the procedure of the state where the court is located. And I guess I'm wondering whether we'll pay you later is really a procedure. It doesn't feel like a procedure. You know, I'll pay you later. That's not a procedure. That seems like a substantive impediment to her rights. So I'm not sure this Rule 69, which I think you're not speaking in terms of that, but that seems to be the legal federal hook to send us over to this law, and I'm not sure it's a procedure because it feels like a substantive deprivation of her immediate entitlement to money. She's losing out because she doesn't have the money. And you're saying, well, we'll pay you sometime. What we're actually saying is we're going to pay you within three years because that's what Law 68 and Law 66 establish. You have to set up a payment plan within three years. It's not, to use your example, Judge Hamilton, it's not a 20-year plan. It's a very definite three-year period, and that's been paid for. Why is three years constitutional? And to add to that, to Ms. Garcia-Gordon, three years plus what she's waited now, it seems probably 20,000 years for her. So it's from her perspective. Well, we only went to trial last year. Let me add this. The purpose of Section 1988 when it was enacted was for a counsel like Mr. Gonzalez-Munoz to take cases such as Ms. Garcia-Gordon's and for her to be able to afford an attorney and at least have somebody who would be willing to try these cases. Otherwise, she would have never been where she is. But prior to Law 66, in 2014, and I'm speculating here, but it was already pretty evident that the territory of Puerto Rico was going to go broke, and that's why they passed that law. Nobody's challenged it in any court because they had the power to do that. And then after the Fiscal Oversight and Management Board came in, and the Fiscal Oversight and Management Board, as this court well knows, has final say over any fiscal determinations that the government of Puerto Rico makes. And I agree with you, unfortunately. They passed this law. I don't know how much money you have. I really know nothing about that. You are a public corporation. The statute talks about public corporations. I understand that. But what I guess I don't understand is, or I guess I'm really having trouble now, seeing this as the kind of procedures, you know, that might be how you go about it, but this is not what you're really saying. You're just saying we're not going to pay for a while. And that strikes me as this is a federal lawsuit, and federal law applies, except the federal law here adopts state laws for a limited purpose, and now I'm thinking this isn't the limited purpose. What we understood, or I should say I understood, is that the judge had frozen payment with the SIN IDEA statement. Do you think you're prohibited from writing a check this afternoon? I know it's not budgeted right now, so I don't know if the phone is on. Do you think the law, do you think the judge has forbidden you from paying this judgment? No, I think he just postponed it. Ian, what's shocking to me is he postponed it. If you get a payment plan in your representation today is we've done nothing about that. I mean, it just feels like a bunch of games. It's not a bunch of games. It's strictly once we, the way this works is I give it to my client. They have to, the client takes it to his governing board, who then takes it to the fiscal oversight and management board, who actually controls what the FONDO pays or doesn't pay. In your responses today, none of that's happened. Not yet. But as soon as this court, this is an order, to take your hypothetical, if you issued that order this afternoon, tomorrow that process would start because we're not going to challenge this court under any circumstances. So it's not an issue where she's going to get paid. If we were to order this afternoon, which I guess we could, pay those $300,000, whatever, you know, which are not challenged, within 10, you know, let's say by November 12th, she would have that check by November 12th. The board, the fund, everybody has to comply with that order unless somebody were to request a state of the court. I don't know what their accounts are like, but I would have to believe that, and I'll be blunt, the last time I checked their fines, they had a $200 million surplus. So you would have to believe that they could pay it. And if you give us until November 12th, I could imagine that they could do it. I have about $120 more surplus because I paid my policy yesterday online. So there's a little bit more money there. Well, like I said, the Fiscal Oversight and Management Board knows that, and they take that money to pay other stuff with it. Now, if I may touch, do you still have questions on the payment? Because it does look like it. Go ahead to the merits of the first case. The first situation now in comparison is a lot easier. All the applicable jurisprudence says that even for the purposes of this argument, let's say that my brother is right about miles. He still has to prove the four prongs of a permanent injunction. Where is irreparable harm? Well, it's certainly irreparable harm that she can't work where she wants. That doesn't seem that hard to me to understand, or where she's entitled to work. Let me reframe that. She wants to work in this place. If it were true that she were kicked out of that place for retaliatory reasons, and now she has to work over there, why wouldn't that be irreparable harm? Because it isn't true. This issue was litigated before Judge Arias was briefed out. That has nothing to do with irreparable harm. That goes to success. She doesn't succeed on the merits because Judge Arias found that that wasn't retaliatory. It just isn't retaliatory. For starters, she's getting paid her mileage every single day to go back and forth. If you look at docket number 388, there's a joint motion from my brother and I telling the court, we arranged it, she's going to get paid this much. By the way, she lives in Vega Baja. That's 17 miles closer. I mean, Manatee is 17 miles closer to Vega Baja than to Arecibo. So she's getting a savings of 34 miles every day on her car. More importantly, it's been two and a half years since she's in Manatee. Absolutely not a single complaint, not a single motion arguing any kind of retaliatory or anything. As far as where she'd like to work, she works for the FONDO. And what the collective bargaining agreement states is that you work in a region. She works in the Arecibo region. There's two offices there for the FONDO, Arecibo and Manatee. She's working in Manatee. And as we explained to the court and the court held for us, there was a dire need for nurses in Manatee. And there still is. The FONDO needs nurses, period. We had the other issue of Ms. Baerga, who was at that time the only FONDO employee working remotely. By the way, is she retired now? I believe so. So Ms. Baerga was working remotely. She was the only FONDO employee. The FONDO had changed its policies on working remotely and ordered everybody to come back. So what we thought was that this would be an excellent way of meeting both problems, fixing the problem of having Ms. Baerga come back to work physically, and sending a nurse, a good nurse, because that's never been in question, sending a nurse to a place where she was desperately needed. On top of which, the CBA, because you should note, she's a unionized employee. The union's not here. And they're not because we're not breaking the contract. Just let me understand their argument. They say the union contract allowed her to transfer to this other office for a maximum of five days. And what is your response? No, they are part of the same region, and that provision does not apply? Is that your position?  That applies when you're sending somebody out of the region. And this one, that's my understanding. This is why the union hasn't appeared or supported her position, because the way they look at it, and what do we have to do? Well, when you take somebody out of one office and you put them in another office in the same region, you pay their mileage fees, which is what she's getting to this day. So irreparable harm. She didn't go to work for the Arecibo office of the FONDO. She went to work for the FONDO. And as is stated in the briefs, she worked for, like, 10 years in San Juan. Then she transferred over to Arecibo. So we don't see where the irreparable harm is anywhere. And, by the way, there is absolutely nothing preventing her in a future, in a near future, to go back to Arecibo. It's all depending on what the FONDO needs in each office. Let me ask a question, and let's assume for the purpose of this question that we rule in your client's favor. Isn't there still, again, there's still, it's not the best situation because she did prevail in her case, even though injunctive relief wasn't awarded. But can't the parties somehow resolve this matter, even if we affirm? And, again, it might make it easier in the long term for the fund. It might make it more comfortable for her. And, again, it's not that, even if it's not required by law or by a ruling, can't that be resolved somehow? It could, I suppose. I mean, the fact is that the people that she alleges did all these things are not there anymore. There's a different person running Manantí. There's a different regional director. They seem to change every year. So it's like a whole, so I don't know. I don't know if there's a new administrator, not the one that was then when she, in 21. There's been a couple since then. So, George, you know me. I would, you know, there's a saying in Spanish. Let me say this. Right. What if we were to give you, let's say, until this Friday or until the next Friday, try to resolve this without us having to rule on the equitable relief? You might reach a result because. But to be realistic, you have to look at what she's asking for in this permanent injunction. It's not just I have a divine right to work in Arecibo. It's also take Bajarga out of the world, Bajarga. And maybe that one's moot, right? But Bajarga is under ADA. So that puts. That does seem moot. That's why I asked you. You told me she's retired. That's my understanding. I could brief in an informative motion and find out. It would eliminate one of the problems if she were. So that's one thing. But then she's also asking to remove documents out of her permanent record that are not part of her permanent record. That was made clear again and again in briefs. Those documents are utilized. Right. But Judge Helpe's point, I mean, I'll be honest. That doesn't seem like whether this is right or wrong the biggest thing in the world, whether those documents are there or not. It seems like the kind of thing people could work out and avoid adverse rulings about. But what I would. What I'm about to tell the court is this. The fondo is a highly unionized place. And those unions are very, very ferocious about not only defending their rights, but acquiring rights. And this could do that. Okay. Thank you. Thank you, Counsel. Mr. Gonzalez, four-minute rebuttal. And let me begin by asking you before your time starts running. Is this a sort of situation that the parties could try to sit down and maybe reach an agreement? Your Honor, we did for the preliminary injunction. We had a hearing set for Monday and the Friday before we reached an agreement. So she was a prevailing party in the preliminary injunction. She can be a prevailing party if we reach an agreement. I would agree to that. But there are a couple of things that I need to bring to the attention of this court because they have been said and they're not accurate. Docket number 101 is a motion regarding PROMESA that I submitted to the court informing that the fondo was not a covered entity of the government of Puerto Rico. It's there. Number two, not running to get the approval of the payment plan because the judge stated that is wrong. The judgment became final in August 14, and the order staying the execution was in December 4. Number three, in the documentary evidence volume at page 240 and 241, you have article 25 about transfers. That is the only evidence before the court that was presented to the jury regarding the transfers. The fondo has been saying throughout all the litigation by word of their attorney and no evidence that they can transfer an employee wherever they want because they have the authority. They have a collective bargaining agreement, and it says that she should have not been there for the last 664 working days. In terms of the attorney's fees, I would like to also add that even if an agreement is reached on the permanent injunction, that was not a requirement. That should have not prompted. You mean an agreement for the preliminary injunction? No, no. The denial of the permanent injunction should have not prompted a 20% downward adjustment. In Lipset, they were granted the entire fee award, and they were denied equitable relief. Okay? The other ground that the court, and I must stress it, that the court used to justify the downward adjustment is that it did not. It was impaired. Its ability to determine if it was reasonable were impaired. And to do that, it had to choose all the evidence that was not problematic, take it out, and then look at this one in isolation and say, this is too generic because it says a call with a client. I mean, that was a very small deductions he made, but the point is simply it just says call. You can't know whether that was a, I agree it was about the, I'll accept it's about the retaliation case. That's not really the point. The point is we don't know anything about the nature of that call. You know, there are judges in this circuit from, and I cited them, and from Puerto Rico, who say when you have something that may be in a block billing that may not, if you look around and you can figure out what it's about, it's fine. But the problem is that when you take one. A judge has the power to do that. The question is whether the judge in exercising his discretion is obliged to, in essence, how hard the judge is obliged to work to fix the problems in the records you've submitted. Right? Okay. And it's possible for the Court of Appeals to approve both awards that allow this and awards that do not allow it. Judge, very respectfully, one phone call with my client cannot generate an 8.7-hour deduction because that is not reasonable. And that is contrary to the Fees Act. Well, thank you very much. Thank you, Counsel. Thank you, Counsel. That concludes arguments in this case.